Edward P. Kolbow, Appellant, v. Haynes-Landenberg Manufacturing Co.—3 S. W. (2d) 226.

Division Two, February 18, 1928.

*Otto O. Fickeissen, Irvine Mitchell* and *Diehm & Fickeissen* for appellant.

*John J. Nangle* for respondent.

WHITE, J.—Plaintiff, an employee of defendant, sued for damages on account of personal injuries. To plaintiff's evidence defendant filed a demurrer which, April 28, 1924, was sustained. Whereupon plaintiff took an involuntary nonsuit with leave, thereafter filed

his motion for new trial which was overruled, and he appealed. The case was sent to the St. Louis Court of Appeals and for want of jurisdiction was transferred to this court.

The defendant conducted a manufacturing plant on Forest Park Boulevard, where it was engaged in renovating, assembling, repairing and cleaning furnaces and heating plants. The plaintiff was a sheet-metal worker employed by the defendant, and November 29, 1922, was ordered to go to a building, 4110 Louisiana Avenue, St. Louis, for the purpose of repairing a furnace and heating plant, located in the basement. He testified that he had been in the employ of the defendant about three months repairing furnaces at private residences, to which he was sent for the purpose; that it was the practice of the defendant to inspect repair jobs before sending out workmen. The inspector would make report and then workmen would be sent to make the repairs. In his words: "The foreman just turns over repair slips to us and we take the items that are on the repair slips, and if the items are not delivered we go to the stock room and take the balance of the material with us and go out to the job." On this occasion he was sent to the place mentioned, for the purpose of making repairs which the inspector had found to be necessary.

The instructions on the order which he got at that time were that the dust box and the standpipe were to be replaced; also a furnace elbow. Then he describes the job as follows:

"In commencing the work the outer casing and all the warm-air pipes are removed first; we take off this sheet metal casing and disconnect the hot-air pipes. I didn't do any repair work on that casing; the object in taking it off was to get to the interior of the furnace and to remove the defective parts of the furnace."

He said that after taking off the outer casing the next work was to remove heat drums and all the bolts on the top and bottom of the heat drums. Then he continued:

"To remove the standpipe it is customary to chisel all the old bolts off. We never salvage any of them. They are always chiseled off and replaced with new ones, due to the fact to save time. That is what I actually did in this case, and in that respect I followed the custom of the trade. To chisel off a bolt you use about an eighteen-inch chisel with a two-pound hammer, and you strike the head of the bolt a blow with your chisel. The effect of that upon the head of the bolt is that it just blows right off. The bolts, from the constant heat, crystallize, and it flies off.

"When the head flies off what happens to the standpipe? Well, at times, when they are made a trifle large, they sort of bulge out. . . . When I struck the standpipe, I don't know whether it was through a blow I hit the pipe or whether the hammer hit it, but some-

thing flew into my eye and I couldn't see what stuff went into my eye, and I closed my eyes and walked away from it at the time being."

He then testified that he finished his job, and went to the doctor, who had him come back the next day, when the doctor removed from his eye some hard particles which had got into it. The injury was painful, but from the evidence it does not appear that his sight was greatly impaired or his health seriously injured. The grounds of negligence upon which he relied for recovery were:

First: A violation of Sections 6817, 6818, Revised Statutes 1919.

Second: That the employer failed to furnish plaintiff a safe place to work, and had not warned plaintiff of danger of which the defendant should have known by inspection of the furnace to be repaired.

Third: That the place was insufficiently lighted.

Fourth: That it was customary to furnish goggles to one engaged in such repair work, and that the defendant negligently failed to furnish goggles.

I. Section 6817, Revised Statutes 1919, provides that every employer of labor engaged in carrying on a work which may produce illness or disease peculiar to the work or process carried on, or which subjects employees to danger of disease incident to such work, shall for the protection of employees adopt an approved and effective device "for the prevention of such industrial or occupational diseases as are incident to such work."

Section 6818, Revised Statutes 1919, provides the carrying on of any process or manufacture in which antimony, arsenic, etc., or "any poisonous chemicals, minerals, acids, fumes, vapors, gases or other substances are generated, . . . used or handled by employees in harmful quantities, or under harmful conditions, . . . are hereby declared to be especially dangerous to the health of the employees."

These sections are designed to protect employees against exposure to disease which are incident to the work called "occupational diseases," and any manufacturer or laborer in which certain poisonous substances are used, or with which an employee comes in contact, is declared to be dangerous to the health of the employees. The claim here is that the particles which got into the plaintiff's eye were crystallized soot, caused to be crystallized by the use of what plaintiff terms a soot remover. It is none of the articles specifically mentioned in Section 6818, and in order to be within the terms of either section it would have to come under the designation of "poisonous chemicals, minerals, acids, fumes, vapors, gases, or other substances."

Plaintiff testified:

"Before I went out there I had not been told anything about soot remover having been used in this furnace. I am not familiar with soot remover and I cannot tell what effect it would have on the eye; I am not a chemist."

As to the stuff which got into his eye, he said:

"From my experience with ordinary soot this was not ordinary soot that fell into my eye. . . .

"It appeared to me as though it was some sort of chemical matter in there and it crystallized. At times I have met that condition before. From my experience in the trade I would say that the part inside the dust box and standpipe, well, the walls of it were all coated with soot that had been crystallized; the inside had been coated with crystallized soot, and the walls had rust holes in them. . . .

"It is a chemical process that is used in the furnace which is probably sold to people in the effort to remove soot from their furnaces."

After stating how the doctor picked the pieces out of his eye, he said:

"I looked at the pieces; they were pieces, I should say, about the size of a pin head and they were shaped on the principle of a pin head, being flat and round; they were a black glossy substance."

The physician who removed them, Doctor Kemp, testified:

"I looked at those particles I took out of his eye ball; they were small, hard, angular, black—either pieces of crystallized soot, or pieces of rusty iron, or something of that kind; it would be very hard to say unless you put them under a microscope, but most likely they were crystallized form of soot that had blown into the eye."

On cross-examination he said further:

"Carbon is nothing but pure soot, or soot is nothing but carbon, and carbon is the purest form of soot. . . .

"I examined this substance after I removed it; it was very hard and I couldn't break it, and if it had been just an ordinary little piece of dust it would easily have mashed and have been destroyed. I didn't know positively that it was this kind of soot, this chemical poison soot, only that it was a hard substance and it looked like it, and he was working in it and it would only be a natural conclusion that it was. . . . I didn't know whether it was poisonous or not."

That is practically all that was significant in description of the substance which got into the plaintiff's eye.

There are some further statements in repetition of what has been quoted.

There was no evidence that a soot remover had been used in the furnace, nor was there any evidence, if it had been in use, that soot remover was poisonous. The descriptive statements quoted failed to show that the stuff which got into the plaintiff's eye was poisonous.

The doctor did not state its effect on the plaintiff's eye indicated poison. Thus, the evidence wholly fails to bring the case within the provision of Section 6817 or 6818; there was no occupational disease and no poisonous chemicals shown to have been handled.

II. On the day before the plaintiff went to perform the job the defendant's inspector had visited the place for the purpose of ascertaining what repairs were needed to be made, and the negligence alleged by the plaintiff is that the heating plant was inspected by the defendant who thereby knew, or by the exercise of reasonable care could have known, that the inside of said furnace . . . was coated and covered with poisonous chemicals and dust . . . and that the defendant negligently failed to warn the plaintiff of that condition.

Further, the evidence shows that the inspector did not inspect for the purpose of ascertaining whether the place and the appliances were safe for the worker, but for the purpose of ascertaining what repairs were needed. As shown by the excerpts from plaintiff's testimony, the stuff which got into his eye was not visible, nor possible of observation by the inspector. Plaintiff says he first took off the sheet metal casing and disconnected the hot-air pipes. He didn't do any work on the casing. The object in taking it off was to get to the interior of the furnace and remove the defective parts. In speaking of the standpipe he said it had been eaten up, and added, "The inspector didn't see it." And then:

"The inspector hadn't torn down this pipe that the chemicals came out of. The inspector couldn't get nowhere near that pipe. As for my expecting the inspector to see more than I saw after I opened the place up—well, that is what he is getting paid for; he is supposed to inspect it."

Thus it seemed that the plaintiff bases his claim on the alleged duty of the inspector to know of the substance which afterwards got into his eye. The physical facts sworn to by him show that such knowledge was impossible. The only way the inspector could have found out what plaintiff claims was the dangerous condition would have been for him actually to do the job. Not by any possibility could he have seen it without doing the very work the plaintiff was sent to do. He would have had to take off the casing and inspect the inside of the pipe which the plaintiff was sent to replace, and in so doing run the risk of the injury plaintiff received.

Besides, there is not a particle of evidence that the inspector went there for any purpose at all except to report what repairs were necessary. In that case, the only duty incumbent upon the defendant

was to warn the worker of any dangerous condition which the inspector discovered while he was inspecting. [39 C. J. 492.]

III. Another ground of negligence alleged was that the place was insufficiently lighted, and the plaintiff produced some evidence to that effect. There is not a thing in the evidence to show that the insufficient light, if there was such, had anything to do with the injury. The plaintiff made no complaint that he was unable to see how to do his work perfectly, nor does he complain that with more light he might have dodged the particle as it flew towards his eye.

IV. It is further claimed that the defendant was negligent in failing to furnish the plaintiff with goggles; if he had had goggles on very likely the particle would not have got into his eye. This is what he says in relation to it:

"Based upon my eight years' experience as a sheet metal worker I say that it is customary to use goggles in going down into the basement to work on furnaces *when there is anything there that jeopardizes health.* . . .

"I never have used goggles in basements as working on furnaces as that morning, but *I use them around emory wheels.*"

It was customary to use goggles in basements when there is anything that jeopardizes the health. He does not say how goggles could protect his eyes in case of exposure to disease. In his experience he had never used them except when working with an emory wheel.

There is nothing in this, nor in any of the evidence, to show that the defendant knew, or had any reason to believe that there was any peril in that job, protection against which required the use of goggles. The plaintiff himself did not know it until the soot flew into his eye, though his opportunity to know was much greater than that of the inspector.

There is no aspect of the matter in which it can be said that the plaintiff had a submissible case.

The judgment accordingly is affirmed. All concur.