**SERVICE PIPE LINE COMPANY, a**
Corporation, Plaintiff in Error,

v.

Neal A. DONAHUE, Administrator of the
Estate of Wilbur Lee Pratt, Deceased,
Defendant in Error.

No. 35686.

Supreme Court of Oklahoma.

Feb. 8, 1955.

Rehearing Denied May 17, 1955.

Cecil L. Hunt, T. W. Arrington, Fellows & Fellows, Truman B. Rucker, Joe Francis, Tulsa, for plaintiff in error.

Doerner, Rinehart & Stuart, S. J. Clendinning, Tulsa, Jones, Blackstock & Jones, Bristow, for defendant in error.

CORN, Justice.

Neal A. Donahue, administrator of the estate of Wilbur Lee Pratt, deceased, for the benefit of the widow and two minor children of the deceased, brought this action against the Service Pipe Line Company for damages caused by the death of Wilbur Lee Pratt by its negligence.

There was little conflict in the evidence presented at the trial.

The deceased, thirty-three years of age, who was the holder of a Class A operating engineer's certificate issued by the city of Tulsa, was employed by the defendant as a maintenance and repairman of equipment within an office building common to the operation thereof.

The office building of the defendant is a six story structure and on the roof there was a flag pole used for the display of the flag of the United States. Among the duties assigned to the deceased was that of raising the flag to the top of the flag pole each morning. The deceased had daily worked in his employment by the defendant for about one month when one morning he was seen falling at a point near the top of the building, and at the same instant, and in close proximity, the flag pole was seen falling. Shortly thereafter the lifeless body of Wilbur Lee Pratt was found on the surface of the street adjoining the building, and nearby was the flag pole.

The evening before the tragedy an employee of the defendant lowered the flag and removed it from the flag pole. At that time he found that the halyard, or endless

rope used to move the flag up and down the flag pole, had slipped from a pulley at the top of the pole. The rope dragged on the side of the pulley and required more pull to move the rope than was usual.

The flag pole had rested in a metal base on the flat roof of the building near the southeast corner of the roof. The base which held the flag pole is approximately three feet from the south border of the roof and three feet from the east border of the roof. The other walls of the building are of solid masonry construction and extend to a height of approximately thirty-three inches high surrounding the roof surface.

The base which holds the flag pole has two metal flanges or standards which are attached to the building through the roof and which extend above the roof about thirty-three inches. These standards are of approximate distance apart as equals the diameter of the base end of the flag pole, but sufficiently apart that the base end of the flag pole may be laid between them. The surfaces of the metal flanges, or standards, which face each other, are flat. There are two holes through each standard; one near the top, and one at a point about half-way between the top and bottom. There are holes through the round flag pole, the axis of which holes bisect the flag pole at a point a few inches from the base end of the pole and several inches above the base end. These holes in the flag pole, and in the standards, are of like diameter and distances apart so that when the pole is erect between the standards the holes may be aligned and bolts may be inserted through the holes with effect to hold the flag pole in erect position between the standards.

The flag pole is a tapering tubular metal piece about twenty-five feet long, about six inches in diameter at the base, and three inches in diameter at the top, weighing approximately two hundred-fifty pounds with a metal fin, or flange, extending out from along its side toward the north at the larger, or base, end of the pole. The outer rim of the fin forms a quadrant helical gear.

The base for holding the flag pole has a horizontal worm gear resting between its upright standards at a point a few inches below the lower bolt holes in the sides of the standard. The worm gear is attached to a shaft extending north from the flag pole base and horizontal to the roof surface of the building.

When the flag pole is erect and in proper place between the standards of the flag pole base, it is held in place, and erect by two bolts, each held by a single nut and the helical gear at the lower end of the pole engages the worm gear in the flag pole base. With the flag pole in such erect position, and the lower hold bolt removed the pole rests upon the upper axis bolt and the pole may be revolved toward the north upon such upper bolt by the turning of the worm gear. Thus the flag pole may be lowered to a position horizontal to the roof, or with the flag pole in such horizontal position and place, and with a turning of the worm gear, the flag pole may be raised to a vertical position and with the hold bolt inserted the pole is then secured in such erect position.

The bolts in the assembly were each threaded, and each had a nut on the threaded end. The bolts were not distinguished by any sign or marking, there being nothing to indicate which was the hold bolt and which was the axis bolt, or whether either of the bolts was the axis bolt. The ends of the bolts, like the whole flag pole assembly, were covered with aluminum paint.

For convenience the upper bolt of the assembly will hereinafter be referred to as the axis bolt, and the lower bolt will be referred to as the hold bolt.

Shortly after the tragedy, upon an examination of the roof of the building, the axis bolt and the hold bolt were found lying side by side at one side of the flag pole base, and two nuts of a size which fit the bolts were lying side by side on the opposite side of the pole base from the bolts. The end of the bolts were painted with aluminum paint, and did not indicate that they had been hit with any object in removing them. A wrench was found at-

tached to the end of the shaft which projected north from the horizontal worm gear in the flag pole base, and another wrench was found nearby on the roof, near to which a smaller bolt without a nut was found. The folded flag was also found lying on the roof near the flag pole base.

The plaintiff averred that the defendant was guilty of negligence in the following particulars, to wit:

"A. In locating said pole on the roof of said building close to the edge thereof so that persons working with said flag pole could easily fall or be knocked from said roof;

"B. In failing to have a guard of sufficient height and length along the edge of the roof so as to prevent persons working around and on said flag pole from falling from said building or being knocked off the roof thereof;

"C. In failing and neglecting to instruct or advise plaintiff's intestate how to properly operate the mechanism of said flag pole so as to lower the same in safety;

"D. In failing and neglecting to inform or advise plaintiff's intestate which of said bolts was the axis and which was the hold bolt;

"E. Failure to give printed or stenciled warning at or near the location of said axis bolt that it was dangerous to remove said axis bolt or that said bolt was not to be removed;

"F. Permitting said axis bolt to be held in place by a simple ordinary threaded hardware nut instead of riveting or permanently fastening said bolt;

"G. Failure of the defendant, after it knew that said rope had been jammed, to have someone to assist, advise or inform plaintiff's intestate as to proper and safe method of lowering said pole for the purpose of correcting said jamming; and

"H. Failing and neglecting, under the circumstances, to provide plaintiff's intestate a reasonably safe place in which to work."

Verdict and judgment was for the plaintiff. The defendant contends the trial court erred in overruling its demurrer to the plaintiff's evidence, and in refusal to direct a verdict for the defendant for the reason that there was no sufficient evidence to establish negligence of the defendant which was proximate cause of the intestate's death.

The defendant was charged with negligence in a failure to act in certain particulars as above noted, and which omissions were alleged to be the proximate cause of the death of the intestate.

The plaintiff's case is based on a theory that the defendant's omissions in direct and natural sequence caused his, intestate's death or induced the intestate's acts which resulted in his death.

The proof establishes the fact that the immediate act which resulted in the intestate's death was his removal of the bolts from the flag pole mechanism preliminary to lowering the flag pole and adjusting the halyard on the pulley at the top.

Admittedly, the intestate was employed as a building engineer upon his showing of experience and skill in the mechanics connected with operations within a building.

The evidence shows the flag pole and mechanism for its control were located on a roof and some three feet from any edge of the roof and that the edge of the roof is surrounded by a parapet arising some thirty-three inches above the roof. The location of the flag pole necessarily caused a man working on the south side of the pole to stand as close as the edge of the building. Obviously, the danger of permitting a man to work upon the edge of a building approximately eighty feet from the ground in such condition should have been apparent to any reasonable man, and further that a reasonable, careful employer, in such case, would have installed a guard rail, or have taken some measures to protect its employees from the possibility of a fall from the roof. Certainly it might reasonably be anticipated by such employer that a workman might stumble and fall therefrom, or that an employee who had

not been properly advised how to operate the mechanism of the flag pole in order to lower the same in safety, or who because of the failure to print, stencil or otherwise advise an employee, who was without other knowledge, that the flag pole mechanism did not have a permanent axis bolt which would prevent removal of the pole, might be misled into thinking that either or both such bolts could be removed with safety.

The evidence in this case disclosed that the superintendent of the defendant company knew of the customary method used by manufacturer for fixing a permanent bolt such as the axis bolt in question, so that the same could not be removed by a misinformed employee at the time the flag pole in question was installed, and he knew, also, that there were only two bolts with a simple nut on each bolt holding the flag pole in question.

Although the roof in question was not in and of itself dangerous and the flag pole was not in and of itself dangerous, the placing of the flag pole on the edge of a roof eighty feet above the sidewalk and street, and requiring an employee, who was not instructed as to the danger confronting him, to work around said flag pole may have created a hazardous situation and may have constituted a failure of the employer to furnish the employee a safe place to work. The plaintiff contends that by reason of the use of ordinary hardware bolts and nuts, and without any stenciling, or red marking to show which of the bolts was an axis bolt or hold bolt in the mechanism, a workman might be lead to believe that the pole was held in place by a pin concealed inside the steel casement, and that it would therefore be safe to remove either or both bolts.

It was further contended by the plaintiff that the using of a single simple nut on each of the bolts would mislead a man of experience because of the custom prevalent.

At the time of the construction of the flag pole in question there was a custom of manufacturers and those installing machinery of the kind and character used in constructing the flag pole to make an axis bolt permanent, or to indicate which removable bolt was the axis bolt, quoting from the testimony of Harold L. Sims, a machinist of twenty-two years experience:

"Q. The question is; what methods are customary in the vicinity in regard to a bolt that you don't want to have removed? A. There is a number. Bradding, welding, drilling and putting a pin through it. A number of ways.

"Q. I will ask you, Mr. Sims, and look at this picture, Exhibit 'D', and assume these two bolts are the only bolts holding the flag pole in position, is there anything on there to indicate which one should be removed for lowering the flag pole? A. No.

"Q. Is there anything customarily practiced among men installing and operating machinery to indicate how that shall be done? A. There is such a practice.

"Q. What is that practice? A. You can stencil on the pivot bolt there, the words 'Pivot Bolt' and the words 'Do Not Remove'.

"Q. Where would you do that? A. On the flange. * * *

"Q. Mr. Sims, is there any * * assuming that this flag pole was painted one color, is there any custom used with reference to paint on the machinery to indicate or warn of danger? A. Different manufacturers have different methods. It is usually a different color paint. * * * the perfect color is red, almost universally used all over the United States in erection work."

A close analysis of the numerous cases decided by this Court on circumstantial evidence will disclose that this case is a stronger case than most of them, in that an eye witness saw the deceased and the flag pole falling from the top of the building at about the top floor of the building.

It was discovered by the employee who lowered the flag the night before the accident that the halyard, which was used to raise and lower the flag, was off the pulley. It was necessary to lower the flag pole in order to adjust the halyard on the pulley at the top of the pole. The deceased was

the only man on duty on the morning of May 20, 1950. It was his duty to raise the flag at the time in question. The flag pole was held in position by only two bolts, each of which was held by a single simple hardware nut.

The superintendent, Mr. Benson, who was the employer of the deceased, testified that he did not advise the deceased in regard to the mechanism of the flag pole. That the entire flag pole, including the nuts and bolts in question, was painted aluminum. There was nothing on the casement to indicate the axis bolt. Both nuts were removed and placed on one side of the flag pole, and the bolts were removed and placed on the opposite side of the flag pole. There was no guard rail to protect an employee working around the base of the flag pole. After the removal of the bolts there was nothing holding the flag pole in position except its weight on the worm gear at the base of the pole. After the bolts were removed the only way the flag pole could fall would be to the north on top of the building, or to the south and to the street below. The flag pole was seen falling to the south and the deceased was seen falling with the flag pole, in close proximity to it. Both the flag pole and the deceased fell in close proximity to each other on the street eighty feet below.

This Court has held many times that in a civil case all that the plaintiff is required to do in order to establish his case is to make it appear more probable that the injury came in whole, or in part, from the defendant's negligence, than from any other cause. This fact may be established by circumstantial evidence.

The opinion of National Valve & Mfg. Co. v. Wright, 205 Okl. 565, 240 P.2d 769, 772, is very similar in facts to this case, except the man in the National Valve case was required to work fifty feet above the ground, whereas in this case he was required to work eighty feet. Quoting from the opinion:

"* * * The danger of permitting a man to work upon this ledge in such condition should have been, we think, apparent to any reasonable man, and we think further that a reasonably careful employer in such case would have installed a guard rail, or taken some measures to protect its employees from the possibility of a fall from the ledge. Certainly it might reasonably be anticipated by such employer that a workman might stumble and fall therefrom, or that a fall might be caused by the intervening acts of some third party, particularly when work was being conducted on the roof above at various times, in which case there would be the possibility that some object might be accidentally dropped upon the ledge from above. * * *"

The plaintiff suggests that by reason of the use of ordinary hardware bolts and nuts, and without any stenciling, or red marking, to show which of the bolts was an axis bolt, or hold bolt in the mechanism, a workman might be led to believe that the pole was held in place by a pin concealed inside the steel caseseal, and that it would therefore be safe to remove either or both bolts. The defendant suggests that to avail the plaintiff's suggestion must find support in evidentiary facts from which it may be found there was a probability that the workman was misled.

The circumstances in proof showing the axis bolt was removable and was not marked with a danger sign, and that the mechanism contained no stenciling directed to the purpose of showing the purpose of the axis bolt and as distinguished from the purpose of the lower hold bolt, and that the intestate was not given specific instructions concerning the mechanism for lowering the flag pole, all suggest the possibility that had the defendant made the axis bolt more difficult of removal, or marked the bolt with a danger sign, or given the intestate specific instructions concerning the mechanism, the accident might not have occurred, or the intestate might not have acted to remove the bolts and cause his death. But the plaintiff, to show a right to a recovery, must make it appear more probable by a preponderance of the evidence that the accident was caused in whole or in part by the defendant's negli-

gence than by some other cause. The evidence of these circumstances is ample to justify the act of the lower court in submitting the issue to the jury. A jury may select between two or more probable causes in arriving at its verdict.

A similar case to the one at bar in relation to the discussion of circumstantial evidence and inference based upon an inference, is Connelly v. Jennings, 207 Okl. 554, 252 P.2d 133. In this case the deceased who was employed by Connelly and others on a drilling rig, went to work on his tower about 3:00 p. m., and about three hours later he came down from the swivel board to the derrick floor, which was about 70 feet below. He was last seen walking toward a nine-step stairway leading off the derrick floor to the ground. This stairway was used by Jennings to get to the shale-shaker where he performed certain of his duties. Approximately five minutes after he was seen walking toward this stairway he was found by a fellow employee lying on the ground east of the stairway, face down, with blood running from his nose and mouth, and there was a scuffed place on his forehead. He died on the way to the hospital a short time after he was found.

No one saw the deceased fall or what actually caused him to fall. The stairway was defective in that the top step was narrow, the riser did not conform to the others, there was but one handrail, and it was too steep, all of which was apparent to the deceased. The steps by their construction invited the user to walk facing the stairway in ascending, and with his back to it in descending, and were so defective that it was easy for any one to lose his footing or become overbalanced and tumble headlong down the stairs.

So, in the case at bar, the base of the flag pole involved was so constructed as to mislead a workman desiring to lower the pole into believing that either or both bolts could be removed with safety, and that the pole was anchored by a pin inside the metal encasement, and virtually amounted to an invitation to the deceased and other workmen to remove either or both bolts in low-

ering the pole. Then, too, in the absence of proper guard rails, the pole was so located that it was easy for the deceased or other workmen working on the flag pole to be knocked or shoved by the flag pole and to lose footing or become overbalanced and tumble headlong from the roof of the building.

In Mealy-Wolfe Drilling Co. v. Lambert, 208 Okl. 624, 256 P.2d 818, 819, we held:

"In a civil case all that the plaintiff is required to prove in order to establish causal connection between defendant's negligence and plaintiff's injury is to make it appear more probable that the injury came in whole or in · part from the defendant's negligence than from any other cause, and this fact may be established from circumstantial evidence."

▮ The plaintiff is not required to sustain the burden of making all the causes advanced by his proof preponderate to a greater degree than those advanced by the defendant. Proof to support either cause that the jury adopts is all that is required.

The jury undoubtedly indulged the presumption that the intestate at all times was acting with due care and caution for his own safety and was without fault in premises as the basis of its finding of negligence in the omissions with which the defendant was charged and as a proximate cause of the death, although the jury may have indulged the presumption that intestate did not act with due care for his own safety. Further, had the jury adopted the proof that defendant offered of acts on the part of intestate negativing the presumption that intestate acted with due care for his own safety, the jury would have been justified in finding for defendant.

Upon either of the last two hypotheses, the jury would have been measuring liability for the fatal incident in the light of proof of defendant's omission and plaintiff's contributory negligence.

▮ It is true that the question of the contributory negligence of a plaintiff is always one for the jury, and we fully adhere to that rule, but a plaintiff in the first

instance must show negligence on the part of the defendant and a causal connection with an injury received, before a case is made for a jury's decision. We think plaintiff's evidence, as disclosed by the record, meets this test. Had the jury refused to indulge the presumption of due care on the part of the intestate, or had the jury found from all of the evidence in the record that intestate's death arose from his own contributory negligence, no doubt its verdict would have been for defendant and such verdict perforce would have to stand. However, since the jury did the opposite, its verdict for plaintiff must stand.

■ Granted that a presumption of due care in the performance of his work accompanied the intestate, likewise a presumption in performance of duty attends the defendant until overcome by circumstances in proof or direct evidence from which the inference of negligence and causal connection with injury may be drawn. The negligence of a defendant cannot be inferred from a presumption of care on the part of the person killed alone. One presumption cannot be based on another. Tweed v. First Nat. Bldg. Corp., 203 Okl. 31, 218 P.2d 356. But in this instance plaintiff's case does not depend upon a presumption, or a series of presumptions, because there is evidence of facts and circumstances lending support to the presumption in favor of intestate and this is sufficient to carry the issue of proof to support plaintiff's claim beyond the presumption stage.

■ All of the averments of negligence on the part of defendant, as above set forth, are combined or summarized in "H", that is, in the defendant's failure to furnish intestate with a safe place to work. Whatever presumptions that are indulged in favor of any of those averments, it is sufficient to say that in each instance the presumption does not stand alone, but finds support in the surrounding circumstances and the proof of independent facts.

In the arguments herein both parties have cited various cases wherein there was a statement and application of the rule that negligence and its causal connection with an injury may be established by circumstantial evidence, but defendant asserts that the stated rules admit of the further rule that a proper presumption of negligence and the causal connection with an injury can only be drawn from circumstances in proof and may not be based on a presumption that has no evidentiary basis. In the cases cited by the plaintiff there were circumstances in proof, as there are in this case, to show the existence of a dangerous condition of premises or such evidence as to permit an inference of negligence without regard to the manner in which the injured party had acted, or without reference to the acts of the injured party. These cases serve to counterbalance those cases cited by defendant under the extension of the foregoing rules.

■ Herein, defendant has shown, and likewise it may be said to be shown by plaintiff's proof also, that intestate was guilty of an erroneous act which created a condition that led to his death. However, it is equally clear that defendant was guilty of creating a condition that preceded intestate's acts, and induced intestate's acts or failed to present to him, or to advise or instruct him, about the dangerous condition which intestate's experience would enable him to cope with. Under these facts, intestate's acts could only be contributory negligence. At the defendant's request the lower court carefully and adequately instructed the jury on the issue of contributory negligence in the list of intestate's acts. The jury verdict should stand. Other propositions raised are without substantial merit.

JOHNSON, C. J., WILLIAMS, V. C. J., and ARNOLD and BLACKBIRD, JJ., concur.

WELCH, DAVISON, HALLEY and JACKSON, JJ., dissent.

HALLEY, Justice (dissenting).

I am forced to dissent in this case. In the first place the trial court erred in not sustaining a demurrer to the evidence because there is no evidence that the defendant was guilty of any negligence which

caused the death of the deceased, Wilbur Lee Pratt. The only duty Pratt had to perform outside the building was to raise the flag each morning. He was never instructed to make repairs on the flag pole. No fair minded person would ever say that there was anything dangerous about this roof and flag pole to a person whose only duty was to raise the flag. For the thing he was to do, Wilbur Pratt had a perfectly safe place to work. No witness testified that it was ever the duty of Wilbur Pratt to repair the flag pole in question. It is a hornbook principle of the law of master and servant that a master is not chargeable with negligence for failing to warn a servant of danger when he is injured while working outside the scope of his employment voluntarily and without orders. Every appellate court that has had occasion to pass on the proposition sustains this rule. I think the case of McCue v. National Starch Mfg. Co., 142 N.Y. 106, 36 N.E. 809, is in point and almost on all fours with the case at bar. It was held that where a master does not require a servant to adjust machinery used by him when out of order but has a machinist to perform such duty, and the servant is injured while adjusting such machinery the master is not liable for failure to instruct as to the manner of adjustment and to warn him of the danger. It is to be remembered that in the case under consideration Service Pipe Line Co. had not accepted the building completely and all repairs and adjustments were to be made by the contractor and not by employees of Service Pipe Line Co. See also Marshall v. Burt & Mitchell Co., 75 N.J.L. 624, 69 A. 183, and the cases cited to Note 97 at page 509, of 39 C.J. See also 56 C.J.S., Master and Servant, § 302.

There was nothing in this record to show that Pratt was a green hand. He was licensed as a Class A Engineer by the City of Tulsa, that contemplates that the holder has had five years practical experience in the handling of high and low pressure boilers and other work connected with maintenance of an office building. In addition to this, the deceased was a Lieutenant, Junior Grade, in the United States Naval Reserve. He had served thirteen years in the United States Navy, active and reserve duty. He undoubtedly was as experienced with raising and lowering flags as most experienced building engineers. It is clearly evident that he should know as much about flag raising as the most experienced. Even if Pratt had been ordered to repair the flag pole, which he was not, the defendant is not required to instruct an experienced employee on matters of this kind. In 56 C. J.S., Master and Servant, § 305, this statement is made:

"* * * An employee of mature years is presumed to be acquainted with the dangers incident to the service; and the employer may assume that an adult servant possesses such ordinary intelligence, judgment, and discretion as will enable him to appreciate obvious danger, and that the servant knows those facts of common experience and observation which are known to persons of his age and experience, and no duty rests on the master to warn and instruct him as to the possible or probable dangers of the employment, where he is mature, intelligent, and experienced in the work, and the master has no notice or reason to believe that he is not fully competent and acquainted with such dangers. Where a servant solicits employment in a particular calling or for the performance of a certain piece of work, the master has the right to assume that the servant is qualified therefor and need not warn the servant as to the dangers incident to the service, and particularly is this true where the servant makes express representations as to his experience and capacity."

What normal person would think it necessary to warn a grown man of thirty three years not to attempt to lower a flag pole by himself that weighed two hundred and fifty pounds and was twenty-five feet in height when he did not know how to do it. A man with the experience of the deceased would naturally be expected to make inquiry how to lower the pole and if he had known or learned how there was no danger attached to lowering the pole as the method so pro-

vided was one of the best and safest ways to lower a flag pole. A splendid discussion of the rights of a master in situations of this kind is found in Sabere v. Benjamin Atha & Co., 75 N.J.L. 307, 68 A. 103.

There is no evidence in this case that Service Pipe Line knew more about this flag pole and its operation than Pratt. It is a well settled principle that the master will not be held liable for a failure to warn where his opportunity for knowledge of a danger is no greater than that of the servant. See M. T. Stevens & Sons Co. v. Daigneault, 1 Cir., 4 F.2d 53; Allen Gravel Co. v. Curtis, 173 Miss. 416, 161 So. 670; Kolbow v. Haynes-Langenburg Mfg. Co., 318 Mo. 1243, 3 S.W.2d 226; Torgerson v. Minneapolis, St. P. & S. S. M. Ry. Co., 49 N.D. 1096, 194 N.W. 741.

A master is not called upon to anticipate and warn against every possible danger to which the servant may be subjected in the course of his employment. See Ahern v. Amoskeag Mfg. Co., 75 N.H. 99, 71 A. 213, 21 L.R.A.,N.S., 89 and accompanying note.

It is another well settled rule that where, by the exercise of reasonable care, the servant could have known of the dangers likely to be encountered by him that the master is under no obligation to give warning or instruction thereof to the servant. Reasonable care dictates that the servant inform himself as to the proper operation of the flag pole. It was held in Mattos v. Felgenhauer, 154 App.Div. 699, 139 N.Y.S. 379 that the master need not warn or instruct an experienced servant as to the proper way of putting a belt over a pulley. See also 56 C.J.S., Master and Servant, § 295.

There was no causal connection established between the alleged acts of negligence and the death of Wilbur Pratt without basing an inference upon an inference. This Court does not permit that. Ogden v. Baker, 205 Okl. 506, 239 P.2d 393.

To the eight charges of negligence, I say, that none justify, from the evidence supporting them, the submission of the case to the jury. Here are the charges of negligence shown by the letter statements and my answers to them:

"A. In locating said pole on the roof of said building close to the edge thereof so that persons working with said flag pole could easily fall or be knocked from said roof;"

For one raising and lowering the flag, there was no danger.

"B. In failing to have a guard of sufficient height and length along the edge of the roof so as to prevent persons working around and on said flag pole from falling from said building or being knocked off the roof thereof;"

Pratt had no duties around the flag pole except to raise and lower the flag and there was no danger in that.

"C. In failing and neglecting to instruct or advise plaintiff's intestate how to properly operate the mechanism of said flag pole so as to lower the same in safety;"

Pratt was not to repair the flag pole so it was not necessary that he be instructed and furthermore it was a simple mechanism and the defendant had the right to think he would know how to operate it.

"D. In failing and neglecting to inform or advise plaintiff's intestate which of said bolts was the axis and which was the hold bolt;"

No duty to inform employee at this point the same as in C.

"E. Failure to give printed or stenciled warning at or near the location of said axis bolt that it was dangerous to remove said axis bolt or that said bolt was not to be removed;"

Pratt had no duty to use the pole mechanism and if he did not know, he should have informed himself by making inquiry.

"F. Permitting said axis bolt to be held in place by a simple ordinary threaded hardware nut instead of riveting or permanently fastening said bolt;"

No duty at the time but no one showed that it was not safe to those who knew their business.

"G. Failure of the defendant, after it knew that said rope had been jammed, to have someone to assist, ad-

vise or inform plaintiff's intestate as to proper and safe method of lowering said pole for the purpose of correcting said jamming; and"

No one testified that it was necessary to lower the pole and·if it was to be lowered it was the contractors duty.

"H. Failing and neglecting, under the circumstances, to provide plaintiff's intestate a reasonably safe place in which to work."

For the work he was instructed to do, the place to work was not dangerous.

The author of the majority opinion assumes too many facts. There are no facts proven to justify the application of the three paragraphs of the syllabus of the majority opinion.

In the light of the foregoing, I am·firmly of the opinion that the demurrer to the evidence should have been sustained.

Beyond question, the motion for directed verdict should have been sustained in the light of positive proof that all building employees of Service Pipe Line were instructed that they were to make no repairs about the building but same were to be made by the contractor. Not a single act of negligence charged against the defendant has any foundation in the face of· the evidence that the plaintiff was instructed not to make any repairs on the building. In the late case of Hunter Construction Co. v. Watson, Okl., 274 P.2d 374, we reaffirmed the rule in Hanson v. Atchison, T. & S. F. Ry. Co., 184 Okl. 480, 88 P.2d 348, and Kurn v. Reese, 192 Okl. 78, 133 P.2d 880, that where an employee deliberately disregards a rule of instruction of his employer thereby placing himself in a place of danger resulting in his injury that the employee is guilty of primary negligence which would bar his recovery for injuries.

Regardless of the motives that may have actuated the deceased in the case at bar, the fact remains he was violating the instructions given ·him and others as to repairs on the building. To make what he thought were· necessary repairs on the flag pole, he attempted to lower the pole when he did not know how and it was not shown anywhere that it was his duty to lower the pole. If the pulley was "fouled up" it was the responsibility of the contractor and not Pratt to repair it.

In my opinion it was error to submit the question of whether deceased had been told that only the contractors employees should make repairs since two or three witnesses so testified and this testimony was not denied or rebutted in any way. This is espe-· cially true in light of the fact that no evidence was introduced to show that Pratt was to repair the pulley on the flag pole when it did not work properly. This instruction permitted the jury to surmise about a fact about which there was no question.

The majority opinion relies heavily on National Valve & Mfg. Co., v. Wright, 205 Okl. 565, 240 P.2d 769; Connelly v. Jennings, 207 Okl. 554, 252 P.2d 133, and Mealy-Wolfe Drilling Co., v. Lambert, 208 Okl. 624, 256 P.2d 818. I was a concurree in the first and last of these cases and· wrote Connelly v. Jennings and I say that the facts in those cases clearly establish the negligence of the master while in the case at bar such evidence is wholly lacking.

There are many more reasons why the majority opinion is wrong in affirming the trial court but I will stop here.

The defendant was made an insurer in the case at bar and no such legal responsibility was upon it at that time.

I dissent.